**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

CAROLYN CLARK, as Administratrix of    :
and Surviving Spouse of the Estate of    :
Thomas Everett Clark, Jr.,    :
                       :
       Plaintiff,    :
                       :
v.                           :     CASE NO.: 1:09-CV-101 (WLS)
                       :
PHILIP DENNIS IRVIN, *et al.*,    :
                       :
       Defendants.    :
_____ :

## ORDER

Before the Court are Defendant Universal Am-Can, Ltd.'s (hereinafter "UACL") Motion for Summary Judgment (Doc. 98) and Plaintiff's Motion for Partial Summary Judgment (Doc. 103).[1] For reasons set forth more fully below, the Court **GRANTS** Defendant UACL's Motion for Summary Judgment (Doc. 98) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 103).

## PROCEDURAL and FACTUAL BACKGROUND

Originally filed in Dougherty County Superior Court (Doc. 1-1) and later removed to this Court in June 2009 (Doc. 1), the above-captioned negligence case asserts three counts, including one for wrongful death and survival (Count III), against Defendants Philip Irvin, D & L Trucking

---

[1] With the exception of Plaintiff's failure to move for summary judgment on her claims of direct liability against Defendant UACL and for punitive damages against Defendant UACL, the issues on which Defendant UACL and Plaintiff move for summary judgment and on which they oppose each other's Motions for Summary Judgment are opposite sides of the same argument. The facts surrounding those issues are the same as well. Specifically, Defendant UACL submits identical arguments as to its broker status in support of its Motion for Summary Judgment and in opposition to Plaintiff's Motion for Partial Summary Judgment, while Plaintiff submits identical arguments as to Defendant UACL's motor carrier status in support of her Motion for Partial Summary Judgment and in opposition to Defendant UACL's Motion for Summary Judgment. Accordingly, the Court's Factual Summary and Discussion, including the Analysis, are intended to address arguments raised in both Motions. The Discussion, however, only cites the Parties' briefing filed in relation to Defendant's Motion for Summary Judgment due to, as noted above, the identical substance of the arguments raised in both Motions.

of SI, Inc. (hereinafter "D & L"), and UACL.[2]  (Doc. 95).  Plaintiff's case is based on a fatal collision that occurred in January 2009 in Dougherty County, Georgia, between a van operated by Plaintiff's deceased husband, Thomas Everett Clark, Jr., and a tractor-trailer driven by Defendant D & L's owner and president, Defendant Irvin.  (*Id.* ¶¶ 7-25).  Plaintiff claims that at the time of the collision, Defendants Irvin and D & L were acting as agents of and operating under a bill of lading issued by Defendant UACL, which had dispatched Defendants Irvin and D & L to carry freight from Tyson Valley Distribution Center in Arkansas to North Star of Florida in Florida.  (*Id.* ¶¶ 8-14, 13).  Approximately four months after the accident, Plaintiff brought this suit.  (*See* Doc. 1-1).

In Count I of her Complaint, Plaintiff alleges that Defendant Irvin was negligent in causing Mr. Clark's death and that Defendant D & L, along with Defendant UACL, is vicariously liable for said negligence of Defendant Irvin, Defendants D &L's and UACL's "statutory employee."  (Doc. 95 ¶ 15).  Also in Count I, Plaintiff claims that Defendants D & L and UACL are directly liable for their violation of the Federal Motor Carrier Safety Act, as codified in the Code of Federal Regulations (hereinafter "FMCSR"), and Georgia law.  (*Id.* ¶ 27).  In Count II, Plaintiff claims that Defendant Irvin was wanton, reckless, and consciously indifferent to the consequences of his actions.  (*Id.* ¶¶ 29-31).  On these grounds, Plaintiff seeks general damages, punitive damages,[3] special damages for the full value of Mr. Clark's life, and reimbursement for any medical and funeral expenses incurred by Mr. Clark's estate.  (*Id.* at 10 & ¶¶ 39-40).

---

[2] Plaintiff's original Complaint included a fourth count against John Does 1 through 10, who were dropped as Defendants in January 2011 pursuant to Plaintiff's Motion to Drop Parties John Does 1 through 10 and to Amend Complaint.  (Doc. 94).  Additionally, in May 2011, National American Insurance Company was terminated as a defendant pursuant to the Court's grant of NAIC's Motion for Summary Judgment.  (*See* Doc. 144).

[3] Plaintiff's claim for punitive damages against Defendants Irvin and D & L was denied pursuant to the Court's May 2011 grant of said Defendants' Motion for Summary Judgment.  (*See* Doc. 145).  To the extent Plaintiff raises such claims for punitive damages against Defendant UACL in her Complaint, they are addressed herein but only within the context of Defendant UACL's Motion for Summary Judgment.  *See infra* Part III.c.

On January 31, 2011, both Defendant UACL and Plaintiff filed their respective Motions for Summary Judgment and for Partial Summary Judgment. (*See* Docs. 98, 103). On February 12, 2011, Plaintiff filed her response to Defendant UACL's Motion for Summary Judgment (Doc. 124), to which Defendant UACL replied on February 28, 2011 (Doc. 137). Defendant UACL filed its response to Plaintiff's Motion for Partial Summary Judgment on February 21, 2011, to which Plaintiff responded on February 28, 2011 (Doc. 136). The Court finds that Defendant UACL's Motion for Summary Judgment as well as Plaintiff's Motion for Partial Summary Judgment are fully briefed and are now ripe for review.

## FACTUAL SUMMARY

The following facts are derived from the Second Amended Complaint (Doc. 95); Second Amended Answer (Doc. 120); Defendant UACL's Statement of Material Facts not in Dispute (Doc. 98-1), Plaintiff's Response to Defendant UACL's Statement of Material Facts (Doc. 124-1), Plaintiff's Statement of Material Facts not in Dispute (Doc. 103-1), and Defendant UACL's Statement of Material Facts in Dispute (Doc. 133), all of which were submitted in compliance with Local Rule 56;[4] and the record in this case.

---

[4] Local Rule 56 states:

> The movant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact shall be numbered separately. Statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court. Affidavits and the introductory portions of briefs do not constitute a statement of material facts.

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate. The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Rule 56(f) of the Federal Rules of Civil Procedure.

On December 4, 2007, Defendant UACL and Transplace Stuttgart, LP, entered into a Truckload Motor Carriage Agreement under which Defendant UACL agreed to haul a load of poultry from Tyson Valley Distribution Center in Pottsville, Arkansas, to North Star in Port Orange, Florida.[5] (Doc. 124-4 (Ex. 3)). The Agreement labels Tyson Foods, the shipper, the third-party beneficiary of shipment obligations performed by Defendant UACL as "CONTRACTOR" and transportation obligations arranged by Transplace Stuttgart as "BROKER." (*Id.* at 2 (Article 1.1)). Article 1.5(a) holds Defendant UACL responsible to Transplace Stuttgart for the full and proper performance of its contractual obligations, even if Defendant UACL subcontracts its obligations, which the Agreement prohibits it from doing without Transplace's written consent. (*Id.* at 3 (Article 1.5)).

On December 5, 2007, Defendant UACL, through Tracy Harrold of Glenn National Carriers, an agent of Defendant UACL (Elliott Dep. 12:7-10, 17:12-21), arranged for Defendant Irvin, through his company Defendant D & L, to transport the load of Tyson poultry from Arkansas to Florida on a D & L-owned tractor-trailer[6] (Doc. 98-1 ¶¶ 6-8; *see also* Doc. 124-13 (Ex. 14)). Transplace would often contract with other brokers such as Defendant UACL to broker a load when they did not have the trucks to haul the freight they had agreed to transport. (Harrold Dep. 13:10-14 ("[Transplace] may call other brokers that might . . . know of trucks in the area to cover the freight.")). Accordingly, although Defendant UACL is a registered carrier

---

All documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment shall be clearly identified for the court. Where possible, dates, specific page numbers, and line numbers shall be given.

M.D. Ga. L.R. 56.
[5] On January 13, 2009, Defendant UACL and Transplace also entered into a Load Confirmation and Rate Agreement for the transportation of the subject cargo. (Doc. 103-3). Said Agreement designated Transplace as the broker and Defendant UACL as the transportation provider/"Contractor" to "provide transportation related services for Transplace and its customers." (*Id.* at 2).
[6] According to Tracy Harrold's testimony, Defendant Irvin contacted Harrold looking for a load to haul while he was in the Russellville, Arkansas area. Upon receipt of his call, she called Transplace to determine if it had a load to transport from that area, which it confirmed it did. (Harrold Dep. 27:1-11). She then provided information about the load from Transplace to Defendant Irvin. (*Id.* at 27:15-25).

with the Department of Transportation and has its own Federal Motor Carrier Safety Administration common carrier authority, Defendant UACL claims that the Tyson load was transported under Defendant UACL's distinct broker authority. (Doc. 35-1 (Limback Aff.) ¶ 3; Harrold Dep. 83:14-20).

Pursuant to this arrangement between Defendant UACL and Defendant D & L, the two parties entered into a written Master Brokerage Agreement, which designated Defendant UACL as the broker and Defendant D & L as a motor contract carrier.[7] (Doc. 124-13 at 2 (Ex. 12)). More specifically, Defendant D & L, as the carrier, was labeled "an independent contractor," who "IN NO WAY [WAS] TO BE CONSIDERED AN AGENT, EMPLOYEE OR JOINT VENTURER OF UACL, in the providing of services" under the terms of the Master Brokerage Agreement. (*Id.* at 2; *see also* Doc. 35-1 ¶ 17 (indicating that Defendants D & L and Irvin did not have authority to represent themselves as Defendant UACL's agent); Doc. 35-3 ¶ 13 (explaining that Defendant D & L understood its relationship with Defendant UACL to be one of independent contractor)). Defendant UACL, on the other hand, was labeled "a Property Broker in the business of securing freight from underlying shippers and negotiating with common and contract carriers for the transportation of such freight in interstate or intrastate commerce . . . ." (Doc. 124-13 at 2).

---

[7] It appears that Defendant Irvin, on behalf of Defendant D & L, signed the Master Brokerage Agreement. (Doc. 124-13 at 4). Relying on Defendant Irvin's deposition, however, Plaintiff claims that Defendant Irvin's signature on the Agreement was forged. (Doc. 124-1 at 10). Defendant Irvin also testified that he had never seen the Master Brokerage Agreement prior to his deposition. (Irvin Dep. 124:20-22). Despite Defendant Irvin's rejection of his signature, the Court notes that Defendant Irvin did not disclaim the Broker Confirmation Sheet for the subject load, which incorporates by reference the terms of the Master Broker Agreement. (*See* Doc. 124-11 at 2). Furthermore, Defendant Irvin has confirmed and executed the obligations stated in the Master Brokerage Agreement, as demonstrated by the facts and evidence of the case, and therefore, ratified Defendant D & L's agreement with Defendant UACL to perform its motor carrier obligations. (*See, e.g.*, Irvin Dep. 63:10-19 (testifying that he had agreement with Defendant UACL, which he identifies as a broker, to haul loads)). Finally, Plaintiff has not been disputed that Defendant D & L would not have been allowed to haul the load for Defendant UACL without a Master Brokerage Agreement signed by Defendant D & L. (*See* Harrold Dep. 89:1-5 ("All carriers have to be preapproved and sign brokerage agreements.")).

In said Agreement, in accordance with its motor carrier status, Defendant D & L "warrant[ed] that all shipments transported by [it] on behalf of UACL will be transported under [D & L's] motor carrier authority, . . . . " (*Id.* at 3). And while Defendant D & L was "solely responsible for the dispatch of [its] driver," it was required "to contact UACL's designated agent . . . upon completion of loading and with the name of receiver and status and delivery immediately upon completion of delivery." (*Id.* at 3-4). Any other requirements for the shipment, including the manner of loading and unloading and the pick-up and delivery times and locations, were provided to Defendant D & L pursuant to Tyson's requirements. (Harrold Dep. 87:24-88:14).

On January 13, 2009, Defendant UACL issued Defendant D & L a Brokerage Confirmation Sheet, which confirmed Tyson's requirements with respect to the load such as maintenance of ¾ of a tank of fuel, as well as the rate the load would pay to Defendant D & L. (Doc. 124-11 (Ex. 10) at 2). This Sheet also "serve[d] to supplement the Master Brokerage Agreement between [UACL,] Brokerage Division" and Defendant D & L. (*Id.*). According to Harrold's testimony, Transplace knew at this time that Defendant UACL had re-brokered the freight to Defendant D & L and did not object to the rebrokering. (Harrold Dep. 61:5-11, 87:3-9 (stating that Transplace knew carrier was "outside truck" and that she told Transplae she was rebrokering load on behalf of UACL)).

Defendants D & L and Irvin carried the freight under a straight bill of lading, prepared by Tyson, which listed Defendant Irvin as "AGENT . . . PER UACL" and Transplace as "CARRIER." (Doc. 124-5 at 2; Harrold Dep. 84:3-5). Defendant Irvin used money loaded on a Comdata bank card, issued to him by Defendant UACL as an advance against the load for which

he would be paid, to pay for expenses along the route.[8]  (Doc. 35-3 ¶ 15; Elliott Dep. 38:20-23).

Any amount of the advance not used during the trip remained on the card for Defendant D & L's

use on its next trip.  (Doc. 35-3 (Irvin Aff.) ¶ 15).  Notwithstanding this pay arrangement for this

particular load, Defendant Irvin was paid his regular salary by Defendant D & L.  (*Id.* ¶ 3).

As with other loads, UACL instructed Defendant D & L as to where and when to pick up

and deliver the subject load based on Tyson's instructions.  (*See* Doc. 98-1 ¶ 17; Harrold Dep.

88:5-13 (testifying that Tyson decided pickup and destination times and locations for load)).

Also pursuant to Transplace's requirements, Defendant Irvin was required to provide Harrold, as

Defendant UACL's representative, with updates on his location throughout the course of his trip.

(Harrold Dep. 28:15-21 & Ex. 8 at 3 (in-transit communication requirements imposed on UACL

by Transplace)).

Defendant UACL, however, did not control the tractor-trailer used by Defendants D & L

and Irvin, which route Defendant Irvin took, or the manner or method of Defendant Irvin's

driving or Defendant D & L's loading/unloading of cargo.  (Doc. 98-1 ¶ 18; Harrold Dep. 88:2-

14).  Rather, Defendant D & L made these determinations and also provided maintenance for,

repaired, and insured the subject tractor-trailer, since Defendant UACL had no ownership or

lease interest in the tractor-trailer.  (Doc. 35-3 ¶¶ 3 to 6 (requiring D & L to maintain certain

types of insurance coverage and holding D & L "liable . . . for all loss, damage or liability

resulting from their transportation of any property arranged for by UACL . . . as a common

---

[8] The Parties dispute whether Defendant UACL and Defendant Irvin/D & L split the fee for the load, as contended by Plaintiff (Doc. 124-1 ¶ 13), or whether Defendant Irvin/D & L was paid a flat rate by Defendant UACL, as argued by Defendant UACL (Doc. 98-1 ¶ 54).  However, the method by which Defendant Irvin/D & L was paid is not material to the Court's determination of the existence of an employer-employee/agent between Defendants Irvin and D & L and Defendant UACL, particularly in light of the lack of other evidence establishing such a relationship.  *See infra* pp. 17-19.  Whether Defendant D & L and Defendant UACL each received a percentage of the fee paid by Transplace to haul the load or whether Defendant D & L was a paid a flat rate is no indicia of Defendant UACL's control of Defendant D & L's operation.  Either method is simply one way in which Defendants Irvin and D & L had to be paid for their work.

carrier . . . ."); Doc. 35-1 ¶¶ 4, 5 (providing that Defendant UACL does not own equipment used by brokered carriers)).

On January 14, 2009, during the course of Defendant Irvin's route from Arkansas to Florida, Defendant Irvin's tractor-trailer malfunctioned while traveling on Georgia Highway 520. (Doc. 95 ¶¶ 18, 21). Defendant Irvin was forced to "coast" the tractor-trailer and park it on the roadway, halfway in the travel lane of the highway and halfway on the shoulder of the highway. (*Id.* ¶ 22). As he brought the tractor-trailer to a stop, he called Harrold, with whom he remained on the phone for approximately three to five minutes to obtain phone numbers for a repair shop in the area. (Harrold Dep. 32:5-6, 33:24-34:1).

As Harrold reached for the book of telephone numbers, she heard the collision through the telephone. Her telephone connection with Defendant Irvin was then lost. (*Id.* at 34:1-5). Allegedly as a result of his inability to see the tractor-trailer, Mr. Clark's van had slammed into the rear of Defendant Irvin's tractor-trailer. (Doc. 95 ¶¶ 17, 25). Mr. Clark suffered critical injuries from the collision and died soon thereafter. (*Id.* ¶ 25).

After several failed attempts to contact Defendant Irvin (Harrold Dep. 34:8-9, 38:1-2), Harrold called Transplace to let it know that Defendant Irvin had been in an accident, although she did not have full knowledge of the accident details. (*Id.* at 38:3-8). Defendant Irvin subsequently called Harrold to tell her that a fatality had occurred and that he had contacted his insurance company, which would tow the tractor-trailer. (*Id.* at 44:16-18). Harrold again contacted Transplace to inform it where the tractor-trailer would be transported, so Defendant UACL and Transplace could "take care" of the freight. (*Id.* at 44:18-24). Because of Defendant Irvin's inability to complete the haul, Transplace arranged for another carrier to transport the load to Florida. (*Id.* at 90:16-18).

On these facts, Defendant UACL argues that it is a "broker" not subject to liability under Georgia law and FMCSR, is not Defendants D & L's and Irvin's statutory employer, and did not maintain a joint enterprise with Defendants Irvin and D & L. These grounds, it asserts, require a denial of Plaintiff's claims for punitive damages and general claims of negligence, as well as an award entitling it to summary judgment. (Doc. 98-1 at 9 to 20). Plaintiff, on the other hand, opposes said argument proffered by Defendant UACL and instead argues that she is entitled to summary judgment because no genuine issues of material fact remain as to whether Defendant UACL is vicariously liable for the actions of Defendants' Irvin and D & L as a motor carrier or as a joint venture with Defendants D & L and Irvin. (Doc. 103 at 1). Having established the undisputed material facts, the Court now turns to an examination of the facts and Defendant UACL's and Plaintiff's arguments in the context of the summary judgment standard and relevant law.

## DISCUSSION

### I.     Standard of Review for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Hoffman v. Allied Corp., 912 F.2d 1379, 1383 (11th Cir. 1990). A fact is "material" if it is a legal element of the claim under the applicable substantive law and it might affect the outcome of the nonmoving party's case. Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). A judgment is

appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. *See* <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 804 (1999); <u>Celotex Corp.</u>, 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact. <u>Celotex Corp.</u>, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id.</u> at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 324. To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or "show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must provide "enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing <u>Anderson</u>, 477 U.S. at 251).

On a motion for summary judgment, the court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. <u>Celotex Corp.</u>, 477 U.S. at 322-23; <u>Allen</u>, 121 F.3d at 646. However, the court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Considering these standards, the Court is left to determine whether a genuine issue of material fact remains as to whether Defendant UACL was a broker or motor carrier subject to the vicarious and direct liability provisions under FMCSR and Georgia law.

## II.    The Parties' Arguments[9]

Defendant UACL first moves for summary judgment and opposes Plaintiff's Motion for Partial Summary Judgment regarding Plaintiff's claims of vicarious liability.  Contrary to Plaintiff's argument, Defendant UACL contends that it acted as a broker, not as a motor carrier, at the time of the subject collision and therefore cannot be liable for the actions of Defendants D & L and Irvin.  (Doc. 98-2 at 8).  It bases this argument on the fact that it did not direct the time, method, or manner of Defendants Irvin's and D & L's work, nor did it have the power to hire, fire, discipline, or oversee any of D & L's drivers.  (*Id.* at 10-11).

Defendant UACL next denies its status as a statutory employer or agent under FMCSR as a basis for liability because, among other reasons, it had no ownership or lease interest in the tractor-trailer operated and owned by Defendants Irvin and D & L; Defendant Irvin never applied for employment with Defendant UACL; and neither Defendant UACL's name nor logo appeared on the subject tractor-trailer.  (*Id.* at 12-14).  In fact, notes Defendant UACL, Defendants D & L and Irvin are independent contractors, whose acts, under Georgia law, cannot be attributed to Defendant UACL, since they "are not subject to the immediate direction and control of" Defendant UACL  (*Id.* at 15 (citing O.C.G.A. § 51-2-4)).

Additionally, Defendant UACL contends that no joint venture existed between Defendant UACL and Defendant D & L because of the lack of mutual control shared between the two over the equipment or labor utilized in transporting the freight.  (*Id.* at 17).  Finally, Defendant UACL maintains that no evidence exists that it directly violated the relevant provisions of the Federal Motor Carrier Safety Act or Georgia law.  (*Id.* at 8, 19-20 ("There is an absence of any evidence to support these vague claims and therefore, summary judgment is appropriate.")).

---

[9] *See supra* note 1.

In opposition to Defendant UACL's Motion for Summary Judgment and in her Motion for Partial Summary Judgment, Plaintiff argues that Defendant UACL acted as a motor carrier throughout, up to, and including the subject collision. (*See* Doc. 124 at 1). According to her, Defendant UACL held itself out to Transplace Stuggart as the carrier of the subject freight and holder of the subject tractor-trailer throughout the entire transaction. (*Id.* at 9, 10, 16). Additionally, Plaintiff submits that no agreement exists between Defendant D & L and/or Defendant Irvin and Transplace that represents Defendants D & L and Irvin as the sole parties responsible for the transportation of the subject load. (*Id.* at 9, 10, 16 (citing 49 C.F.R. §§ 390.5, § 371.7(b))).

In support of these assertions, Plaintiff notes that Defendant UACL "hires owner-operators such as Philip Irvin and his trucking company to transport loads and generate revenue for UACL; retains the right to terminate employment; and admits that it is responsible for personal injury claims arising out of crashes . . . ." (*Id.* at 6, 7 (citing Ex. 11; Harrold Dep. 46:16-19) (noting that Defendant UACL independently investigated subject accident and arranged for USDA inspector to inspect load after accident)). As to Defendants Irvin and D & L in relation to the subject transaction, "Defendant UACL controlled [Defendant Irvin]'s delivery, loading times, and places[;] . . . shared the profits of each load[;] provided a Comdata (bank) card [to Defendants Irvin] and placed funds on the card for D & L . . . to purchase fuel"; and required Defendant Irvin to scan and transfer his trip documents to Defendant UACL's parent corporation, Universal Truckload Services. (*Id.* at 6, 12 (citations omitted)).

Furthermore, says Plaintiff, in the six months prior to the subject collision, Defendants D & L and Irvin hauled loads for Defendant UACL, which required Defendants D & L and Irvin to pick up and deliver at specific places and times; maintain certain air pressure in the tractor-

trailer's airbags and fuel in the refer unit; maintain certificates of insurance with UACL listed as certificate holder; and contact a UACL-associated telephone number in emergencies, for daily check-in, and upon the delivery of loads. (*Id.* at 10-11 (citing Exs. 8, 10; Harold Dep. 21:10-11)). Plaintiff also notes that Defendant Irvin signed bills of lading as "Phillip Irvin UACL" in the subject transaction and in other transactions, thereby holding himself out as an agent for UACL. (*Id.* at 11). For all of the foregoing reasons, Plaintiff maintains that UACL employed Defendants Irvin and D & L as its statutory employee/agent and/or acted in concert or in a joint venture with Defendants Irvin and D & L to haul the subject cargo and is therefore vicariously liable for Defendants Irvin's and D & L's negligence. (*Id.* at 6, 29 (citing O.C.G.A. 51-4-5)).

Based on the foregoing arguments, the Court now must determine whether, in the context of the relevant transaction, Defendant UACL served as a motor carrier overseeing Defendants Irvin and D & L as its employee/agent or served as a broker brokering loads to Defendants Irvin and D & L as an independent motor carrier.

### III. <u>Analysis</u>

#### a. <u>Vicarious Liability</u>

##### i. Motor Carrier Employer-Employee/Agent v. Broker Employer-Independent Contractor

###### 1. *Georgia Law*

Under Georgia law, "an employer generally is not responsible for the torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." O.C.G.A. § 51-2-4.[10] Whether the

---

[10] O.C.G.A. § 51-2-5 provides several exceptions to this general rule, none of which applies here. *See* O.C.G.A. § 51-2-5 ("An employer is liable for the negligence of a contractor: (1) When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance; (2) If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed; (3) If the wrongful act is the violation of a duty imposed by express contract upon the employer; (4) If the wrongful act is the violation

relationship between parties under a contract for performance of labor is that of employer and independent contractor depends on "whether the contract gives, or the employer assumes, the *right to control the time, manner, and method of executing the work* as distinguished from the *right merely to require certain definite results* in conformity to the contract." McLaine v. LcLeod, 661 S.E.2d 695, 699 (Ga. App. 2008) (emphases added) (citations omitted). An employer-independent contractor relationship is presumed to arise "[w]here the contract of employment clearly denominates the other party as an independent contractor . . . unless the evidence shows that the employer assumed such control." Id.

Evidence of such employer control occurs where

the employer . . . retain[s] at least some degree of control over the manner in which the work was done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, . . . or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, as to operative details. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Clarendon Nat. Ins. Co. v. Johnson, 666 S.E.2d 567, 572 (quoting Slater v. Canal Wood Corp., 178 Ga. App. 877, 880(1) (1986)). This employer-independent contractor relationship, or absence thereof, is exemplified by the facts and reasoning in McLaine, 661 S.E.2d at 699.

In McLaine, the plaintiffs filed a wrongful death and personal injury suit arising from a collision between two trucks and a tractor-trailer. 661 S.E.2d at 699. On appeal, the plaintiffs contended that genuine issues of material fact remained as to whether Container South, the defendant cargo property broker, was the motor carrier for *or* employer of the driver whose tractor-trailer caused the collision and whether it was therefore vicariously liable for the driver's

---

of a duty imposed by statute; (5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference; or (6) If the employer ratifies the unauthorized wrong of the independent contractor.").

negligence.  Id.  Finding no merit in this argument, the appeals court affirmed the trial court's grant of Container South's motion for summary judgment in which it contended that the driver and his employer, Kight Trucking, Inc., were independent contractors in relation to Container South and that Container South, therefore, could not be vicariously liable for the driver's negligence.  Id. at 697.

The court reasoned that the contract between Kight Trucking and Container South stated that Kight was an independent contractor; Kight hired the driver, paid his salary, owned the subject tractor-trailer involved in the accident, and maintained and insured the tractor-trailer; and Container South had no authority to discipline or fire the driver and never instructed the driver as to how to drive the tractor-trailer or which routes to take.  Id. at 697, 699-700.  Additionally, although Container South never told the driver where and when to pick up and deliver cargo, the court noted that the specific places and times were set by the shippers, not by Container South; thus, Container South's role was limited to telling Moody when and where to pick up and deliver cargo.  Id. at 700.  For these reasons, the court held that Container South lacked sufficient control over the driver and Kight to be liable for the driver's negligence.  Id. ("Container South merely retained the right to require results in conformity with the contract[, while] the driver and Kight Trucking retained the right to perform the work by their own means, method, and manner.").

Similarly, in Clarendon, the court held that the negligence of the driver, who owned the commercial truck involved in the subject collision and had been hired by C & C Motor Freight, could not have been the basis of vicarious liability against the American Trans-Freight ("ATF") defendants (hereinafter "ATF" or "ATF defendants"), the motor carrier, given the driver's independent contractor status.  666 S.E.2d at 569.  The court based this finding on the fact that "[t]he agreement between the ATF defendants and C & C[, who had been hired by ATF as an

independent sales agent to solicit and arrange for transportation services for general commodities,] provided that C & C was an independent contractor with 'sole responsibility of the day-to-day operations and full control and direction of C & C's employees'"; no evidence revealed that ATF exercised control over the day-to-day operations of C & C; and ATF did not know that C & C had hired the driver to transport the load to C & C's warehouse for consolidation with other loads on the day of the accident. Id. at 569, 572. Furthermore, although ATF required C & C to use "approved motor carriers," the court held that "retention of this general right, without more, did not alter C & C's status as an independent contractor." Id. at 572.

With respect to the transaction at issue, the Court finds that Defendant D & L/Irvin was an independent contractor serving as a motor carrier in relation to Defendant UACL and that Defendant UACL was an employer-broker.[11] Similar to the contract between Kight and Container South in McLaine, the Master Brokerage Agreement between Defendant UACL and Defendant D & L in this case states that Defendant D & L was an independent contractor and was in no way to be considered an agent or employee of Defendant UACL.[12] Thus, the presumption of the employer-independent contractor relationship between Defendant UACL and Defendants D & L and Irvin arises. See McLaine, 661 S.E.2d at 699.

This presumption of an employer-independent contractor relationship is supported throughout the record, even by Defendant Irvin himself. For example, Defendant Irvin identified

---

[11] The Court realizes that this holding is inconsistent with its previous finding in a February 2011 Order, which classifies Defendant UACL as a motor carrier instead of broker and Defendants Irvin and D & L as an agent of Defendant UACL instead of an independent contractor. (Doc. 117 at 10-13). The Court, however, reached said finding in the context of a joinder motion, under which the movant's burden of proof was much less stringent, as compared to the movant's burden at summary judgment, and which did not require as extensive of an examination of the record as does the instant Motion for Summary Judgment. Furthermore, the Court would have reached the same ruling denying the motion for joinder had it considered Defendant UACL to be a broker since Georgia's Direct Action Statue, the controlling provision deciding the Motion for Joinder, only permits insurers of interstate motor carriers, and not brokers, to be joined as a party defendant with the insured motor carrier. (See id. at 16-17).
[12] See supra note 7.

Defendant UCAL as its "broker" during the period of time around the January 14, 2009 accident. (Irvin Dep. 63:10-16). In addition, Defendant Irvin's wife and Defendant D & L's business manager, Luann Irvin, indicated that Defendant D & L understood its relationship with Defendant UACL to be one of independent contractor. (Doc. 35-3 ¶ 13).

Furthermore, the record reveals no other evidence of Defendant UACL assuming control over Defendants Irvin and D & L. Defendant UACL had no authority to discipline Defendant Irvin or fire him from Defendant D & L. Defendant D & L paid Defendant Irvin's salary, owned the subject tractor-trailer in the accident, and provided maintenance and insurance on the tractor-trailer. While, according to Plaintiff, Defendant UACL controlled Defendant Irvin's delivery, loading times, and places, that information was determined by the shipper, Tyson, and not Defendant UACL, which merely communicated the information to Defendant Irvin. The required amount of fuel in Defendant D & L's tank was also a Tyson requirement. (Harrold Dep. 49:10-12).

It is also significant that Defendant Irvin contacted Harrold when his tractor-trailer broke down only to obtain telephone numbers of repair shops in the area; he did not contact Harrold to seek Defendant UACL's assistance to repair the tractor-trailer. Moreover, the evidence reveals that Defendant Irvin contacted *his* insurance company, which had the tractor-trailer towed, immediately after the accident, with no involvement by Defendant UACL. Defendant UACL was only interested in determining the location where the tractor-trailer had been towed to preserve the freight.

This case record is also devoid of evidence that Defendant UACL ever instructed Defendant Irvin as to how to drive his tractor-trailer or which routes to take when hauling loads for Defendant UACL. And according to safety director Douglas Richard Moat, Defendant

UACL has no oversight over the safety and training of brokered carriers such as Defendant D & L; rather, brokered carriers are required to operate in a safe manner in accordance with their DOT authority and FMCSA guidelines and must have less than a 75% SAFER stat score. (Moat Dep. 36:18-37:5, 83:6-25, 84:19-85:12 (noting that UACL provides mandated safety training to contract/leased carriers, who attend UACL safety meetings, unlike brokered drivers)).

Additionally, contrary to Plaintiff's argument, Defendant UACL's provision of the Comdata card to Defendant Irvin does not indicate the latter's control over the former's operations. The Comdata was the means by which Defendant Irvin chose to be paid by Defendant UACL a partial advance for hauling the subject load. He was not forced to take the card, nor was he forced to pay for his fuel with the card. He could have used the card for whatever purposes during his route.

Finally, Defendant UACL's requirements that Defendant D & L maintain certain air pressure in the subject tractor-trailer's airbags, maintain certificates of insurance with UACL listed as certificate holder, and contact a UACL-associated telephone number under certain circumstances do not lend themselves to the employer-employee/agent relationship. For example, the requirement of daily as well as emergency check-ins and calls upon delivery of loads was imposed by Transplace, not Defendant UACL, as noted in the Factual Summary. (*See* Harrold Dep. 28:15-21 & Ex. 8 at 3 (in-transit communication requirements imposed on UACL by Transplace)). Said requirement was also necessary to keep track of and in the event of an accident, preserve and transport the load to the agreed-upon destination. (Moat Dep. 24:2-12, 25:1 ("[An outside carrier] ha[s] to understand that . . . they have to operate under the guidelines of what the DOT regulations are . . . . [T]he concern is going to be with the freight . . . .")). This

requirement as well as the certificate of insurance and tire pressure requirements[13] do not represent sufficiently operative details to constitute "supervision" within the meaning of Georgia's imputable negligence provision at O.C.G.A. § 51-2-5.  *See* <u>Clarendon</u>, 666 S.E.2d at 572 ("It is not enough that [Defendant UACL] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, . . . .").   For all of the above reasons, no genuine issue of material fact remains as to whether Defendant UACL is a broker-employer and Defendant Irvin/D & L is an independent contractor motor carrier in the context of the subject transaction.

## 2.  *FMCSR*

The terms of vicarious liability are also statutorily defined under FMCSR.  *See* 49 C.F.R. § 31101; <u>Clarendon</u>, 666 S.E.2d at 571 ("Statutory employment is a theory of vicarious liability created by the FMCSR." (citation omitted)).  According to FMCSR,

> Employee means any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety.  Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle) . . . .  Employer means any person engaged in a business affecting interstate commerce who owns or leases a commercial vehicle in connection with that business, or assigns employees to operate it . . . .

49 C.F.R. § 390.5.

The existence of a lease between a carrier and a driver is the defining element to create the statutory employer-statutory employee relationship between the two under FMCSR.   To illustrate, in <u>Clarendon</u>, the court found that ATF was not a statutory employer under FMCSR and thus, was not vicariously liable for the driver's negligence.  The court reached this holding

---

[13] The certificate of insurance and tire pressure requirements appear to be general requirements either established by Tyson, with Defendant UACL only ensuring compliance, or if established by UACL, only intended to ensure the safety and preservation of the load.  Under either circumstance, these requirements do not represent the requisite amount of control that Defendant UACL must have had over Defendants Irvin and D & L to be considered its motor carrier employer.

based on the lack of evidence that the driver had leased himself or his truck to ATF for the trip involved in the accident, the lack of ATF's knowledge of C & C's use of driver to transport goods in the manner in which C & C had arranged to do so, and the lack of contact between the driver and ATF regarding the trip. Clarendon, 666 S.E.2d at 572.

In PN Express, Inc. v. Zegel, however, the court determined that the driver was an employee of PN Express, the motor carrier employer, based on the existence of an oral lease of the driver's tractor-trailer to PN Express. 697 S.E.2d 226, 229 (Ga. App. 2010). The driver's admission that the lease existed; the driver's constant daily telephone contact with the PN Express manager during the course of trip and after the collision; and the fact that the driver's truck, although owned by driver, carried the PN Express logo and DOT number led the court to this conclusion. Id. Thus, according to the court, PN Express, as a motor carrier utilizing leased or rented equipment such as the driver's tractor-trailer, was required by FMCSR to "have exclusive possession, control, and use of the equipment for the duration of the lease" and to thereby "assume complete responsibility for the operation of the equipment for the duration of the lease." Id. at 230 (citing 49 C.F.R. § 376.12(c)(1)).

In the current case, the record provides no evidence that Defendant Irvin leased his tractor-trailer to Defendant UACL. It remains uncontradicted that Defendant D & L "wasn't leased in to" Defendant UACL. (Doc. 98-1 ¶ 27 (citing Irvin Dep.:63)). Nor is there evidence that Defendant Irvin's tractor-trailer carried Defendant UACL's DOT number or logo. The evidence reveals that leased carriers "lease" their equipment to UACL's carrier operations, as opposed to brokered carriers such as Defendant D & L whose equipment is not subject to an exclusive lease. (Moat Aff. ¶ 3; *see also* Irvin Dep. 79:23-80:1 ("UACL has their own trucks. And they *have people* that leased directly to them that pulled their trailers.") (emphases added)).

Even Defendant Irvin acknowledged that the relationship between his company and Defendant UACL was not exclusive. (*See, e.g.*, Irvin Dep. 71:18-21 "[The agreement I have with UACL is] not an exclusive . . . , where . . . you strictly go with them.")).

Defendant Irvin was free to accept or reject loads and had the freedom to decide where he wanted to travel to pick up and deliver loads. (Irvin Dep. 72:6-10 "[Tracy Harrold]'ll call me and ask if I want this load. . . . And -- she knows where I want to go, where I don't want to go . . . .")). In fact, as to the subject load, Defendant Irvin contacted Harrold, Defendant UACL's dispatcher, to inquire as to the availability of loads in the Arkansas area; Defendant UACL did not contact him or require him to accept the subject load. Defendant Irvin freely chose to do so.

A lease of Defendant Irvin's tractor-trailer by Defendant UACL also cannot be inferred from the fact that the bill of lading for the load carried by Defendant Irvin at the time of the accident listed Defendant Irvin as "AGENT . . . PER UACL," as it was prepared by the third party entity, Tyson, not Defendants UACL or Irvin. *Cf.* Clarendon, 666 Ga. App. at 571 (citing case where court held that identification of party as carrier on bill of lading prepared by third party without carrier's involvement does not prove party was carrier for trip). Because a review of the record indicates that Tyson had no knowledge of the shipment arrangements between Transplace and Defendant UACL or between Defendant UACL and Defendant Irvin/D & L, Tyson's understanding of the relationship between Defendant Irvin/D & L and Defendant UACL, as reflected on the bill of lading, is of no import to the Court's determination of whether the parties' dealings constituted a statutory employer-statutory employee relationship.

Lastly, it must be noted that under FMCSR, "employer" is defined as a company which "owns or leases a commercial vehicle in connection with that business, . . . or assigns employees to operate it." As the foregoing clearly establishes, however, no issue of fact remains that

Defendant UACL did not own or lease the subject tractor-trailer or that Defendant Irvin was not an employee of Defendant UACL. Hence, for all of the above reasons, Defendant UACL cannot be classified as an "employer" and thus, a motor carrier under FMCSR or Georgia case law interpreting FMCSR as a matter of law. No genuine issue of material fact necessarily remains as to such issue.

### ii. Joint Venturers

"Vicarious liability for the conduct of another party to a joint venture cannot be established without demonstrating a right by each member of the joint venture to direct and control the conduct of the other." Clarendon, 666 S.E.2d at 573 (quoting Rossi v. Oxley, 269 Ga. 82, 83(1) (1998)). As to the relationship between Defendants UACL and Defendants Irvin and D & L, the essential element of mutual control is absent. Defendant D & L had no right to control the rate or terms negotiated with the shipper, Tyson, for the transportation of the load at issue, and as previously explained, Defendant UACL had no right to control the method, manner, or time of Defendant Irvin's driving along the route. Rather, Defendant Irvin was predominantly free to perform the shipment work in his own way, while Defendant UACL predominantly had the right to require that Defendants Irvin's and D & L's performance merely conformed to the requirements of the Master Brokerage Agreement and Broker Confirmation Sheet, as well as its contract with Transplace. Thus, no issue of fact remains regarding Defendant UACL's and Defendant Irvin's/D & L's classification as a joint venturer.

For all of the reasons stated in Part III.a.i-ii, Plaintiff's claim of vicarious liability against Defendant UACL as an motor carrier employer of Defendants Irvin and D & L under Georgia law and FMCSR fails, as does such a claim against Defendant UACL as a joint venturer with Defendants Irvin and D & L under Georgia law. Accordingly, the Court **GRANTS** Defendant

UACL's Motion for Summary Judgment (Doc. 98) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 103) as to Plaintiff's claims of vicarious liability against Defendant UACL. The Court now turns to Plaintiff's claims of direct liability against Defendant UACL for alleged violations of FMCSR and Georgia law.

### b. Direct Liability

The FMCSR allegations that Plaintiff claims Defendant UACL has directly violated are only imposed against motor carriers and their drivers, not brokers. *See, e.g.*, 49 C.F.R. §§ 391 (pre-hiring background checks), 391.25 (driving history annual reviews), 392.8 (emergency equipment, inspection, and use), 393 (verification of proper working condition of tractor-trailer), 395 (log audits), 396 (verification of proper working condition of tractor-trailer), 396.13 (requirements of driver's inspection of motor vehicle). The same conclusion applies to Plaintiff's allegations under the Official Code of Georgia, specifically O.C.G.A. §§ 40-6-202 and 40-8-7(a), the only two Georgia Code provisions cited by Plaintiff in her Complaint. *See* O.C.G.A. § 40-8-7(a) (prohibiting parking of vehicle on roadway); id. § 40-8-7(a) (making it unlawful to drive on highway motor vehicle, trailer, semitrailer, pole trailer, or any combination thereof unless equipment of any such vehicle is in good working order and vehicle is in safe mechanical condition).

Thus, these FMCSR and Georgia statutory provisions cannot apply to Defendant UACL because the Court has determined that Defendant UACL is a broker, not a motor carrier like Defendant D & L or motor carrier driver like Defendant Irvin, and therefore, cannot be responsible for the actions of Defendants D & L and Irvin. In other words, because Defendant UACL was not acting as a motor carrier within this transaction, no duty arose by which Plaintiff can validly argue Defendant UACL was negligent in its failure to comply with regulations

regarding motor carriers; rather, those responsibilities, including the responsibility to competently drive the tractor-trailer, inspect the subject equipment, and repair it upon notice of a malfunction, remained with Defendant D & L as the carrier and Defendant Irvin as the driver.

Lastly, to the extent Plaintiff alleges that Defendant UACL violated the FMCSR and Georgia Code provisions concerning hiring, training, and supervising Defendant Irvin, those claims also fail because Defendant UACL, as the broker, was not responsible for the hiring, training, and supervision of Defendant Irvin. Instead, Defendant D & L, as Defendant Irvin's motor carrier employer, was responsible for Defendant Irvin's hiring, training, and supervision. *See supra* Part III.a.i.1. Additionally, such claims for negligent hiring, training, and supervision fail because Plaintiff raises them for the first time in her response to Defendant UACL's Motion for Summary Judgment. Redding v. Norbord Ga., Inc., No. 5:07-CV-451, 2010 WL 339783, *5 (M.D. Ga. Jan. 21, 2010) (citing Iraoloa & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir. 2003)) (noting that plaintiff's claims not raised in complaint cannot be raised for first time in response to motion for summary judgment). Based on the foregoing, Plaintiff's claims of direct liability against Defendant UACL for violations of FMCSR and Georgia law fail. Therefore, Defendant UACL's Motion for Summary Judgment (Doc. 98) as to Plaintiff's claim of direct liability against Defendant UACL is **GRANTED**.[14]

### c. **Punitive Damages**

As a final and separate matter, the Court must address Defendant UACL's asserted entitlement to summary judgment on Plaintiff's punitive damages claim against it.[15] However, because the Court previously declined to classify Defendants Irvin's and D & L's actions as

---

[14] The Court only rules on Defendant UACL's Motion for Summary Judgment on this issue of direct liability, as Plaintiff has not moved on this issue in her Motion for Partial Summary Judgment. (*See generally* Doc. 103-2).
[15] Plaintiff does not raise the punitive damages issue against Defendant UACL is its Motion for Partial Summary Judgment. (*See generally id.*).

wanton or reckless and thereby denied Plaintiff's claim for punitive damages against Defendants Irvin and D & L in its May 2011 Order (Doc. 145) granting said Defendants' Motion for Summary Judgment, Plaintiff's claim for punitive damages cannot vicariously stand against Defendant UACL. Moreover, because the Court finds that Defendant UACL cannot be directly liable under FMCSR or Georgia law for the accident at issue, *see supra* pp. 23-24, Plaintiff's allegations of direct liability cannot support a punitive damages claim against Defendant UACL. Hence, the Court **GRANTS** Defendant UACL's Motion for Summary Judgment (Doc. 98) as to Plaintiff's punitive damages claim against Defendant UACL.

## CONCLUSION

In consideration of the foregoing discussion, the Court **GRANTS** Defendant UACL's Motion for Summary Judgment (Doc. 98) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 103). Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiff shall take nothing by her Complaint (Doc. 1-1), Amended Complaint (Doc. 41), and Second Amended Complaint (Doc. 95) as to her allegations of vicarious and direct liability and to the extent alleged, her claim of punitive damages against Defendant UACL. **JUDGMENT** shall be entered in favor of Defendant UACL on these claims. Plaintiff's only remaining claim is against Defendants Irvin and D & L.

**SO ORDERED**, this __21st__ day of September 2011.

/s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,**
**UNITED STATES DISTRICT COURT**